IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BETTINA JORDAN,
          Plaintiff,

v.                                        Civil Action No. 3:12-cv-00054-JAG

PATRICK R. DONAHOE,
*Postmaster General of the*
*United States Postal Service,*
          Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the motion for summary judgment filed by Patrick Donahoe, the Postmaster General of the United States Postal Service. The *pro se* plaintiff and United States Postal Service employee, Bettina Jordan, claims that agents of the defendant subjected her to disparate treatment, quid pro quo and hostile work environment sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as well as disparate treatment, failure to accommodate her disability, and retaliation in violation of the Rehabilitation Act.[1] As explained below, the Court grants summary judgment to the defendant on all claims because the plaintiff is unable to offer sufficient evidence to support them.

## I. STATEMENT OF FACTS

Jordan began working for the Postal Service in November 2006 as a Part-Time Flexible ("PTF") employee. Despite her claims of discrimination, she still works at the Merrifield

---

[1] Federal employees bringing a Title VII suit against their employing department, agency or unit must name the head of the department, agency, or unit as the defendant. 42 U.S.C. § 2000e-16(c). This requirement applies by extension to claims brought under the Rehabilitation Act as well. 29 U.S.C. § 794a (applying the "remedies, procedures, and rights set forth" in 42 U.S.C. § 2000e-16 to complaints brought under the Rehabilitation Act).

Processing & Distribution Center ("Merrifield P&DC") in Fairfax, Virginia. The relevant events span the period of 2008 through 2011.

Jordan was employed as a part-time Motor Vehicle Operator ("MVO") during this time, delivering mail to postal branches in a large commercial truck. (Def.'s Mem. Supp. Mot. Summ. J. 2.) Alphonso Jackson ("Jackson") was Jordan's immediate supervisor, and Edward Loose ("Loose") was the Administrative Supervisor for all part-time MVOs. Martin Mittendorff ("Mittendorff") was the Manager of Transportation & Networks for the Merrifield P&DC, and was Jordan's second-line supervisor.

Jordan claims that between May 10, 2008 and December 19, 2008, Jackson sexually harassed her through his comments and conduct. She alleges that Jackson asked her for a hug because it was his birthday and, when asked by the plaintiff why he was looking at her, allegedly stated, "Because I love you." (Compl. 2.) Further, the plaintiff alleges that, on different occasions, Jackson "blew a kiss" at her, "put his hands around" her neck, and put his arm around her shoulders while inquiring when she was working next. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 7.) She expressed her discomfort with these advances. Jordan claims that Jackson then began treating her differently than male colleagues and deliberately changing her work route every day. The plaintiff also claims that Loose contributed to her uncomfortable work environment by criticizing her attendance and work habits.

On December 19, 2008, Jordan began a long period in which she did not show up for work. On December 19, she left work after her shift and did not return to work for several weeks. On December 22, she wrote a letter to Mittendorff describing the conditions of her employment, including the allegedly discriminatory conduct by Jackson and Loose. On December 26, she contacted the Equal Employment Opportunity Commission ("EEOC") to file a

sexual harassment complaint. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 5, 2.) Jordan returned to work briefly on January 17 and 20, and on January 21, 2009, she met with Mittendorff and a union representative to discuss the allegations of her December 22 letter. Jordan got upset, began crying, and walked out during a short mid-meeting break. She did not return. (*Id.* at Ex. 1, ¶ 14.) She claims that Mittendorff verbally attacked her work performance in this meeting in retaliation for her letter and EEOC complaint, so she amended her existing EEOC claim to include this charge of retaliation on January 23, 2009.[2]

With the exception of those few days in January, Jordan remained absent from work from December 19, 2008 until July 2011. She kept her job during this time, on Leave Without Pay status. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2, ¶ 7.) During this time, Jordan sought treatment for severe depression, stress, right arm/shoulder pain, and various other symptoms.

During the years she did not work, Jordan's capacity to drive a USPS truck fluctuated. The plaintiff could not work at all from December 2008 through March 2009. From March 2009 through January 2010, she could not drive a truck due to decreased concentration and stress.

In both March and June 2009, Jordan made requests for "light duty" work. The USPS denied both requests because it had no light duty assignments available. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, ¶¶ 17–18.) After the second denial, Mittendorff forwarded her case to the District Reasonable Accommodation Committee ("DRAC") for determination of any possible accommodations they could make for the plaintiff.[3]

---

[2] The record before the Court does not state how this case was resolved.

[3] The plaintiff alleges that she made a third request for light duty work on August 10, 2009. She provides no proof of this request, and the defendant does not address this alleged third request. Regardless, one can safely assume that the response would have been the same given the proximity in time.

After reviewing Jordan's case and medical information, DRAC determined in August 2009 that driving a truck was an essential function of the job of truck driving, and that the Postal Services could not provide a reasonable accommodation that allowed her to perform her job as a truck driver without requiring her to drive a truck. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 5, Attach. D.)

From January 2010 through June 2011, the plaintiff was capable of operating a commercial vehicle again, but could not work under Jackson, Loose, and Mittendorff, to whom she attributed stress and depression.[4] (Def.'s Mem. Supp. Mot. Summ. J. ¶ 18.) Ordinarily, this would end the matter: a person who cannot work for several years would typically lose her job. The Postal Service, however, took a more lenient approach. In light of Jordan's problems with management, DRAC expanded the geographic scope of their search for a reasonable accommodation and offered Jordan a comparable position driving a tractor-trailer in Norfolk, Virginia, in November 2010. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 4, ¶¶ 7–10.) Jordan thwarted the USPS's attempts to put her back to work. After accepting the offer in Norfolk, and attending training for the position, Jordan withdrew her acceptance in February 2011. (*Id.* at ¶ 11.) Nevertheless, she remained on the USPS roll of workers.

In June of 2011, Jordan notified the USPS that at long last she no longer had medical restrictions and could return to her position as an MVO at the Merrifield P&DC. The USPS made arrangements for returning her to work, as well as converting her from her former PTF status to a Full-Time Regular (FTR) employee. This change was to take effect on July 2, 2011, but instead the USPC converted her to Non-Traditional Full Time ("NTFT") status in August 2011.

---

[4] Jordan's doctor attested to her medical inability to work with her previous supervisors. (Def.'s Mem. Supp. Mot. Summ. J., Ex. 5, ¶¶ 7-9, 13.)

In response to learning of her NTFT status, the plaintiff immediately filed both a grievance with the USPS and a second EEOC claim stating that her conversion to Non-Traditional Full Time status constituted race, color, and sex discrimination, as well as retaliation for filing her previous EEOC claim in December 2008. The USPS investigated the matter and found that Jordan should have been converted to FTR status, and therefore converted her to such on November 19, 2011, with a retroactive date of July 2, 2011. The defendant claims that the mistaken conversion was an administrative error resulting from contemporaneous changes to the MVO collective bargaining agreement, and affected the processing of employment conversions for a number of employees. An EEOC investigation found that Jordan had faced no disparate treatment, discrimination, or retaliation for her mistaken conversion to NTFT status. (*Jordan v. Donahoe*, No. 3:12-cv-227, Dk. No. 1-3, 9–14.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the movant establishes that there is no genuine dispute of any material fact and is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). After an adequate period of time for discovery, Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(a). The court resolves all genuine factual disputes and inferences in favor of the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*), and determines whether there is a genuine issue for trial based on the entire record as a whole. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See id.* at 586–88. The non-movant may not rest upon claims within its pleading, but must "go beyond the pleadings," *Celotex*, 477 U.S. at 324, and "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (emphasis omitted) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law."). Establishing a genuine issue for trial requires the non-movant to present sufficient evidence supporting each element of the claim, such that a reasonable individual could find in the non-movant's favor. *Harik v. Nat'l Aeronautics and Space Admin.*, No. 4:06CV56, 2006 WL 2381964, at *7 (E.D. Va. Aug. 16, 2006). Nonetheless, if the factual context renders the non-moving party's claim implausible, the non-moving party has a higher burden of proof than what is normally required in order to survive a motion for summary judgment. *Matsushita,* 475 U.S. at 587. Trial judges have an affirmative obligation to preclude factually unsupported claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

## III. DISCUSSION

The plaintiff claims that, in violation of Title VII of the Civil Rights Act of 1964, she faced disparate treatment, quid pro quo and hostile work environment sexual harassment, and

retaliation. 42 U.S.C. § 2000e *et seq.* Furthermore, she states that the manner in which the USPS handled her stress-related disabilities and requests for light-duty assignments constituted disparate treatment, failure to accommodate, and retaliation under the Rehabilitation Act. 29 U.S.C. § 701 *et seq.* The Title VII claims fail because the plaintiff does not present a prima facie case of any of the causes of action, and the Rehabilitation Act claims similarly fall short of establishing the necessary elements of each claim.[5]

## A. Title VII

### 1. Disparate Treatment

Jordan claims that she suffered disparate treatment at the hands of the USPS.[6] This claim fails because Jordan cannot establish either of two essential elements of a disparate treatment claim: (1) that she suffered an adverse employment action, and (2) that similarly situated employees outside her protected class received more favorable treatment.

In order to present a prima facie case of disparate treatment, a plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). The Fourth Circuit has defined an adverse employment action to include those acts that "adversely affect the 'terms,

---

[5] Jordan asserts that the Federal Employees' Compensation Act "provides job retention rights to federal employees who have recovered either fully or partially from an employment-related injury or illness and can perform the duties of the original job or its equivalent." (Pl.'s Opp'n to Def.'s Mot. Summ. J. 7.) This Court reads the plaintiff's filings as bringing claims under Title VII and the Rehabilitation Act, but not a Federal Employees' Compensation Act ("FECA") claim. The plaintiff never argues that she was not restored to her position. This opinion will therefore not address FECA.

[6] Jordan alleges her disparate treatment claim solely by printing the words "Disparate Treatment" in boldface in her complaint, followed by a list of cases, without further explanation. (Compl. 7.) Regardless, the Court reads her complaint as alleging disparate treatment based on race, color, and sex.

conditions, or benefits' of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001) (abrogated on other grounds, *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006))). Even when a plaintiff establishes a prima facie case of discrimination, the defendant still has an opportunity to rebut the plaintiff's showing by providing a legitimate justification for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Even assuming the plaintiff belongs to a protected class and performed her job satisfactorily, she cannot establish that she ever faced an adverse employment action. At no point during the relevant time period did the plaintiff face a change to the terms, conditions, or benefits of her employment. She was not fired, demoted, or deprived of any opportunities at the USPS. It is difficult to imagine how anyone can interpret the employer's tolerance of her years-long absence as part of an adverse action. In fact, Jordan ultimately wound up with a promotion after all of her time away from work, EEOC complaints, and lawsuits. In 2008 when she filed her first EEOC complaint, Jordan was a "part-time flexible" ("PTF") employee, with hours and routes that could be changed on an "as-needed basis." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, ¶ 6.) When she returned to work in July 2011, the USPS upgraded her employment status to that of a "Full-Time Regular" ("FTR") employee.[7] (*Id.* at Ex. 1, ¶ 29–31.) This change is effectively a promotion, and thus constitutes the opposite of an adverse employment action. (*See Id.* at Ex. 1, ¶ 29.)

---

[7] Her conversion to FTR status was delayed by administrative error, but the plaintiff was eventually converted to FTR status in November 2011, with a retroactive date of July 2, 2011. (Def.'s Mem. Supp. Motion for Summary Judgment Ex. 1, ¶ 30–32.) As a result, she suffered no actual injury from the delay. Moreover, even if she could establish an adverse employment action due to this delay, the defendant's justification – administrative error – sufficiently rebuts any inference of discrimination.

Jordan refers to some workplace events as adverse employment actions, but fails to offer any proof that they actually happened. First, she claims that Jackson deliberately started changing her work route daily and attacking her work performance to management, but does not offer any evidence beyond an unsworn statement from a coworker, Lorenzo Parker. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Dk. No. 57-1, 4–6.) Nor does she show that coworkers outside the protected class did not face such issues.

The plaintiff further alleges that she was treated differently than similarly situated employees at the USPS, but is again unable to offer any demonstration sufficient to survive summary judgment. She claims that she was forced to work while male drivers would sit in the break room and play cards, that male drivers had preference over her in the assignment of route schedules, and that male employees could clock into work early while she was told that she could not clock in early at all. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 3, 5, 9.) She does not, however, provide any evidence to support these allegations. The Court grants summary judgment to the defendant on the Title VII disparate treatment claim.

## 2. Sexual Harassment

Jordan alleges that she was the victim of both quid pro quo and hostile work environment sexual harassment. The quid pro quo harassment claim fails because Jordan cannot demonstrate that her reaction to the alleged harassment affected tangible aspects of her employment. Jordan's hostile work environment allegation falls well short of the standard, as she does not show that the alleged harassment was "sufficiently severe or pervasive" or unreasonably hostile.

### a. Quid Pro Quo Sexual Harassment

A plaintiff must establish the following elements to state a prima facie case of quid pro quo sexual harassment: "(1) she belongs to a protected group; (2) she was subject to unwelcome

sexual advances; (3) the unwelcome conduct was because of sex; (4) her reaction to the harassment affected tangible aspects of her employment; and (5) there are grounds for holding the employer liable for the harasser's conduct." *Briggs v. Waters*, 455 F. Supp. 2d 508, 518 (E.D. Va. 2006) (quoting *West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 543 (E.D. Va. 2002)). Generally, a change to a "tangible aspect of employment" is a change to the compensation, terms, conditions, or privileges of employment. *See, e.g.*, *Wang v. Metropolitan Life Ins. Co.*, 334 F. Supp. 2d 853, 866 (D. Md. 2004).

Jordan does not show that her reaction to the harassment affected tangible aspects of her employment. As discussed above, the plaintiff was never discharged, demoted, or reassigned at any point during the relevant time period. The plaintiff alleges that after she rebuffed Jackson's advances, Jackson "deliberately started changing the plaintiff's work route daily, harassing her while allow male driver's would do nothing and sit in the drivers break-room and play cards." (Pl.'s Opp'n to Def.'s Mot. Summ. J. 3.) (errors in original). But this is a mere allegation; the plaintiff does not offer any evidence in support of these contentions. Jackson's sworn declaration disputes this account by stating that Jordan was a PTF employee, meaning that she had no fixed schedule and no fixed route. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2, ¶¶ 12–13.) This required changing Jordan's route at times, and whenever Jackson took action to alter her routes or assignments, he "did so to meet the needs of the USPS, and [he] did so on an equal basis, treating all PTF-MVO's in the same manner." (*Id.*) Jordan has not shown that she was subject to route changes different from other drivers. Accordingly, any changes to Jordan's employment were not based on her reaction to any alleged harassment, but were a function of her PTF status, and therefore cannot demonstrate quid pro quo sexual harassment.

The only action taken in relation to Jordan that potentially approaches the territory of affecting a tangible aspect of her employment is when her second-line supervisor, Edward Loose, reassigned the plaintiff's work schedule from the night shift to the day shift for approximately one week in October 2008. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 3, ¶ 8.) Loose's sworn declaration states that he made this temporary reassignment in order to monitor the plaintiff's work performance, which had recently been questioned by other supervisors at the Merrifield P&DC. (*Id.*) The Fourth Circuit has held that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999). Given that the plaintiff's reassignment was neither a downgrade nor permanent, this change to her employment does not constitute an adverse action, and the Court therefore grants summary judgment to the defendant on the quid pro quo harassment claims.

### b. Hostile Work Environment Sexual Harassment

In order to establish a prima facie case of hostile work environment sexual harassment, the plaintiff must prove: "(1) that she was harassed "because of" her "sex"; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 241 (4th Cir. 2000).

The Court grants summary judgment to the defendant because the plaintiff does not establish that the alleged harassment was severe or pervasive. In determining whether or not conduct is sufficiently severe or pervasive to alter the conditions of employment, courts must

look at a number of circumstances, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The "severe or pervasive" element has both subjective and objective components: to be actionable, it must appear severe or pervasive to both the plaintiff and a reasonable person in the plaintiff's position. *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 333 (4th Cir. 2003).

The plaintiff alleges a few instances of harassment which she claims created a hostile work environment. As explained earlier, she claims that in May 2008, Jackson asked her to come into his office, asked her why she had an attitude, and later blew a kiss at her. (Compl. 2). She further alleges that Jackson asked her for a hug because it was his birthday, and later told her that he was looking at her because he loved her. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2, ¶¶ 7–8; Compl. 2–3.) The plaintiff also states that Jackson "put his hands around her neck," and on another occasion, put his arm around the plaintiff's neck and asked her when she was working next.[8] (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2, ¶ 8.) Jackson denies these allegations. (*Id.*)

These bare allegations fall well short of proving that the plaintiff faced a hostile work environment. Plaintiffs in the Fourth Circuit must prove far more troubling facts to survive a

---

[8] Additionally, the plaintiff states that Jackson attacked her work performance to other management staff, which created a hostile work environment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 4.) Jordan's allegation is entirely conclusory and she offers no supporting proof. Moreover, this conduct would not appear severe or pervasive to a reasonable person in the plaintiff's position. She further claims that Jackson would call her on her cell phone during the day. (*Id.* at 8.) Jackson's declaration explains that "[o]n a couple of occasions I did call Ms. Jordan on her cell phone during working hours when I needed to speak to her about work related issues," and "as soon as I learned the Ms. Jordan did not want me to call her on her cell phone, I stopped." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2, ¶¶ 9–10.) This conduct does not come close to adequately alleging the existence of a hostile work environment.

motion for summary judgment. In *Cox v. Rumsfeld*, the plaintiff alleged that one or more of her supervisors "loudly and crudely" described their sexual exploits to her, asked her if she was married or dating, shouted at her aggressively in public locations, improperly invited her to drive together on business trips, and threatened to "beat her like a dog." *Cox v. Rumsfeld*, 369 F. Supp. 2d 748, 752–53 (E.D. Va. 2005). Although the Court recognized that her supervisor's behavior may have been "boorish and at times inappropriate," these allegations did not prove hostile work environment sexual harassment. *Id.* at 757. "Plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). The Supreme Court has emphasized that Title VII was never meant to create a general code of civility for the workplace. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Jordan simply does not prove any conduct that is "severe or pervasive."[9]

Additionally, Jordan attempts to assert the existence of sexual harassment by drawing the Court's attention to certain statements made by Mittendorff during the January 21, 2009 meeting between the plaintiff, her union representative, and Mittendorff. (Compl. 5.) In this meeting, the union representative stated to Mittendorff: "You know that harassment exists here. You know it does," to which Mittendorff responded: "Hey, it's been cut back dramatically, I want it cut back," at which point an argument ensued between the two men. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. A, at 41.) Although this quote alludes to problematic activity occurring at the Merrifield P&DC in the past, it does nothing to bolster Jordan's specific claims of sexual harassment by one or more of her supervisors. Jordan cannot prevail based on generalized

---

[9] Moreover, even if Jordan was able to prove that these instances of harassment actually occurred, a reasonable person in the plaintiff's position would not construe them as severe or pervasive. Although the plaintiff may have had a subjective belief that these isolated incidents, spread out over a period of eight months, constituted severe and pervasive conduct, an objectively reasonable person would not.

conduct that did not affect her specifically. Moreover, though Jordan says that Jackson harassed her in 2008, she does not cite any other instances of harassment during this time frame.

Jordan cannot establish a hostile work environment claim.

### 3. Retaliation

The plaintiff states that she suffered retaliation for filing claims with the EEOC or complaining about harassment to Mittendorff, but this claim fails for lack of an adverse employment action. In order to establish an actionable retaliation claim under Title VII, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the asserted adverse action. *See King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003).

In retaliation cases, an adverse action need not be as dramatic as in discrimination cases. The adverse action component of the anti-retaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment, but rather can be satisfied by showing that the employer took "materially adverse" action, in response to an employee engaging in a protect activity. Adverse action is "material" if it would dissuade a reasonable employee from making or supporting a charge of discrimination. As this court has observed, however, "[t]he Supreme Court spoke in terms of 'material adversity' to differentiate employer conduct that was merely trivial, and thus not a Title VII violation, from employer conduct that was of greater gravity, and therefore implicated Title VII." *Edwards v. Murphy-Brown, L.L.C.*, 802 F. Supp. 2d 670, 677 (E.D. Va. 2011).

Despite the plaintiff's perception that she was slighted and treated unfairly, she simply did not face any adverse employment actions in retaliation for engaging in protected activity. In

fact, when her disabilities subsided and she was capable of returning to work, she moved up from a part-time employee to a full-time employee.

Jordan asserts that the manner in which Mittendorff investigated her harassment complaint was "biased and unfair," and thus constitutes retaliation. (Compl. 1.) She states Mittendorff retaliated against her when he "deliberately discussed unrelated issues such as: plaintiff stay at work late, not clocking in and out for lunch, non-related matters" during their January 21, 2009 meeting about her harassment allegations against Jackson and Loose. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 11–12.) (errors in original). The plaintiff further claims that Mittendorff conducted a cursory and inadequate investigation of her harassment allegations in retaliation for her protected activity. (*Id.* at 13).

These allegations lack merit. The transcript of the January 21, 2009 meeting demonstrates that any questions raised about the plaintiff's work habits were related to her allegations of harassment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. J.) Prior to the meeting, Jordan was asked to bring any notes and documentation she had related to her alleged harassment, as she would be expected to discuss dates, times, and witness names. (*Id.* at Ex. J, 10–11.) She arrived at the meeting without any documentation and could not recall with specificity the dates, times, or specific language used in any alleged instance of harassment, but was able to provide a few names of witnesses that she believed saw these acts of harassment. (*Id.* at Ex. J.) Hearing Jordan's inability to articulate the nature of her harassment, Mittendorff asked her about her professionalism by discussing with her how she had clocked into work late the previous night.[10] (*Id.* at Ex. J, 11.) This line of questioning was hardly an attack on her

---

[10] Mittendorff did not become aggressive or irate with Jordan. He reminded her that they had spoken about his expectations for the meeting, and seeing that she was unprepared, discussed her

character, and the Court is satisfied that it does not even come close to an adverse employment action.

Mittendorff's investigation of Jordan's harassment complaint was adequate. During the January 21, 2009 meeting, Mittendorff repeatedly stated that he would need specific information in order to conduct his investigation and would be passing information along to individuals above his rank. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. J.) The results of his preliminary investigation reveal that Mittendorff conducted an adequate investigation, particularly in light of the scant information Jordan was willing to provide. The record demonstrates that Mittendorff interviewed 17 USPS witnesses who worked at the Merrifield P&DC, including at least 10 MVOs, *none* of whom supported her allegations. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, Attach. B, 2-4.) Although Jordan notes that the Merrifield P&DC has more than 100 employees, after the first 17 interviewed did not corroborate any of Jordan's allegations, Mittendorff reasonably decided to end the investigation. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 13.) The Court has no reason to believe that Mittendorff cherry-picked employees for certain information. Consequently, no evidence suggests that the investigation was "biased and unfair." The Court grants summary judgment to the defendant.[11]

---

issues related to punctuality and clocking in and out of work properly. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. J, 9–14.)

[11] The plaintiff also complains that Mittendorff slightly altered the statements of a union representative in his report. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 19.) The Court is satisfied that this supposed change did nothing to prejudice the plaintiff. Furthermore, Jordan's purported evidence of cellular phone conversations with this union representative does not create any question of fact regarding the retaliation allegations. (*Id.* at 19-20.) Likewise, her allegation that Loose and Jackson were never verbally interviewed pursuant to the investigation is unavailing. (*Id.* at 21.) The investigation revealed that "Mr. Jackson's statement refutes all of the allegations made by Ms. Jordan in detail," and the apparent lack of an interview of Loose does not create for this Court any question of the sufficiency of the investigation. (Def.'s Mem. Supp. Motion for Summ. J., Ex. 1, Attach. B, 3.)

Jordan also alleges that Mittendorff initiated a USPS Office of the Inspector General ("OIG") investigation of her in retaliation for her EEOC claims. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 16.) Mittendorff's "Allegation Initiation" had a good faith basis. In this allegation, Mittendorff explicitly refers to the plaintiff's harassment complaint and describes how Jordan was unable to provide specific information or answer questions about the alleged acts of sexual harassment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 16, Doc. No. 57-2, 19–20.) Moreover, the allegation initiation describes how Jordan submitted a doctor's note stating that she could not drive a truck due to her condition, but without mention of what this condition actually was. (*Id.*) Given that Mittendorff's preliminary investigation revealed that Jordan may own and operate a driving school on the side, his skepticism of her claims was warranted. (*Id.*) These inconsistencies in Jordan's behavior make Mittendorff's allegation initiation reasonable, not retaliatory.[12]

For the reasons stated above, the Court grants summary judgment to the defendant on the Title VII claims.

## B. Rehabilitation Act

When analyzing a claim under The Rehabilitation Act, the Court can rely on jurisprudence interpreting and applying the Americans with Disability Act. *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. Md. 1995) ("Thus, whether suit is filed against a federally-funded entity under the Rehabilitation Act or against a private employer under the ADA, the substantive standards for determining liability are the same.") Other courts have held similarly. *See Rodriguez by Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. N.Y. 1999) (finding

---

[12] Jordan further alleges that Jackson's reluctance to take a polygraph examination pursuant to the OIG investigation would give a jury "reasonable doubt" about the existence of sexual harassment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 4.) It does not, however, support any specific allegations that Jordan has made or show the pervasiveness of any harassing conduct.

section 504 of the Rehabilitation Act and the ADA impose identical requirements and thus claims should be considered in tandem); *Douglas v. Cal. Dep't of Youth Auth.*, 285 F.3d 1226, 1229-30 (9th Cir. 2002) (holding Title II of the ADA and the Rehabilitation Act can be used interchangeably.)

## 1. Disparate Treatment

Jordan claims that she faced disparate treatment because of her disability. A prima facie case of disparate treatment requires the plaintiff to show that: (1) she has a disability; (2) she is otherwise qualified for her job; and (3) she suffered an adverse employment action because of her disability. *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995). Jordan is unable to establish disparate treatment primarily because she was not "otherwise qualified" to perform two of the essential functions of her position: driving a truck and working with any of her prior supervisors. Her inability to perform either function would justify adverse action against her.

An "otherwise qualified" plaintiff must "be 'able to meet all of a program's requirements in spite of his handicap.'" *Tyndall v. Nat'l Educ. Ctrs. Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979)). In determining if Jordan was qualified to hold her position as an MVO, "we must decide (1) whether she could 'perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,' and (2) if not, whether 'any reasonable accommodation by the employer would enable [her] to perform those functions.'" *Id.* (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393–94 (5th Cir. 1993)). The court will address the "essential functions" question before moving to the "reasonable accommodation" claim in the following section.

It is undisputed that the plaintiff's job was to drive a truck at the Merrifield P&DC. It is also undisputed that from the time Jordan left work in December 2008 until January 2010, she could not operate a truck due to decreased concentration and stress. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 18(a)-(b).) By no means could the plaintiff perform the essential functions of a truck driver without driving the truck. From the period of January 2010 through June 2011, the plaintiff could not work in an environment where she would be supervised by Jackson, Loose, or Mittendorff. (*Id.* at ¶ 18(c).) This restriction would prevent her from working as an MVO at the Merrifield P&DC, as her job would require her to have, at the least, minimal contact with her supervisors. Interaction with one's supervisor is a function of her position that bears more than a marginal relationship to the job at issue. Accordingly, Jordan could not perform the essential functions of her job, and was not "otherwise qualified" for the position at any point during her absence.[13]

## 2. Failure to Accommodate

The plaintiff alleges that the USPS denied her requests for reasonable accommodation in violation of the Rehabilitation Act. A prima facie showing of failure to accommodate requires that the plaintiff establish four elements: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with a reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *See Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001).

---

[13] Jordan also alleges that she was treated less favorably than another employee, a Caucasian male, who failed a drug test and did not suffer lost wages or an interruption of his employment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 28.) She provides no proof of such disparate treatment.

As noted above, during part of her absence, the plaintiff could not physically drive a truck. For the remainder of her absence, Jordan's disability prevented her from working under Loose, Mittendorff, or Jackson. (*Id.* at ¶ 18(c).) An employer need not change the fundamental duties of a job as an accommodation. "This circuit has made it clear . . . that the duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands of his present position." Myers v. Hose, 50 F.3d 278, 284 (4th Cir. 1995). In the context of this case, the USPS did not have to change Jordan from a truck driver to some other kind of employee. Further, it is undisputed that "an employer is not required as a matter of reasonable accommodation to transfer or reassign an employee who is not otherwise qualified for the position he then holds." *Myers v. Hose*, Civ. No. JFM-93-3586, 1994 WL 803497 at *2 (D. Md. May 23, 1994) (quoting *Guillot v. Garrett*, 970 F.2d 1320, 1327 (4th Cir. 1992)). More specifically, it is unreasonable as a matter of law for an employee to condition their return to work on their being transferred away from a particular supervisor. *Larson v. Va. Dept. of Transp.*, No. 5:10-cv-00136, 2011 WL 1296510 at *2 (W.D. Va. Apr. 5, 2011). This demand is unreasonable, regardless of whether or not the supervisor is the cause of the employee's medical condition. *Id.* Jordan made such a demand during this time period, and the USPS properly denied her request.

The record indicates that the plaintiff made at least two requests for "light duty" assignments to accommodate her inability to drive a commercial motor vehicle; one in March 2009 and another in June 2009. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, ¶¶ 17-18.) While Jordan claims that these denials constitute the denial of reasonable accommodations, Mittendorff's uncontested declaration offers a simple explanation why these light duty

assignments were not provided: they were not available. (*Id.* at ¶¶ 25-26.) In January 2009, the nationwide economic downturn resulted in a loss of postal volume and the Merrifield P&DC adjusted all routes to make operations more efficient. (*Id.* ¶ 19). In light of these and other changes around the office, management effectively eliminated the use of light duty assignments in the Spring of 2009. (*Id.* at ¶ 20.) After Jordan's March 2009 request for light duty work was denied, her case was referred to the District Reasonable Accommodation Committee ("DRAC"). (*Id.* at ¶ 26.)

Despite the lack of an available reasonable accommodation due to the plaintiff's inability to operate a truck or work with her previous supervisors, DRAC made efforts to find Jordan a position at another location. (Def.'s Mem. Supp. Mot. Summ. J. ¶ 23.) In November 2010, DRAC found a position for Jordan driving a tractor-trailer as a MVS Operator in Norfolk, Virginia. (*Id.* at Ex. 4, ¶ 10.) The job site was actually closer to her home in Richmond than the Merrifield P&DC. (*Id.*) But although the plaintiff accepted this position in November 2010 and attended training for it in February 2011, she withdrew her acceptance just days after the training session. (*Id.* at ¶¶ 11–12.) DRAC continued to try and find a reasonable accommodation for her until she was capable of returning to the Merrifield P&DC in June 2011. Given Jordan's inability to perform the essential functions of her job during her absence, her inflexible demands for no interaction with her supervisors, and the lack of available light duty positions, the Court concludes that the defendant attempted in good faith to find Jordan a reasonable accommodation but could not.

### 3. Retaliation

The plaintiff's retaliation claim under the Rehabilitation Act fails for the same reasons that her Title VII retaliation claim fails-she never actually faced an adverse employment action

as a result of her protected activity. A prima facie case of retaliation under the Rehabilitation Act is identical to one under Title VII: (1) the plaintiff engaged in protected activity; (2) faced an adverse employment action; and (3) there was a causal connection between the two. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 271 (4th Cir. 2001). Although she attempts to claim that certain actions taken at work were retaliatory, none were actually materially adverse.

Jordan's primary allegation of retaliation rests on her delayed conversion from Part-Time Flexible ("PTF") to Full-Time Regular ("FTR") employment status when she returned to work in July 2011. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 33.) Due to an administrative error and the ratification of a new Collective Bargaining Agreement, numerous employees were mistakenly converted from PTF to Non-Traditional Full-Time ("NTFT") in 2011. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, ¶¶ 30–32.) Jordan still contested this error in a grievance procedure with the USPS, and after investigation, the USPS found that she should have been converted to FTR status. (*Id.*) She was therefore converted to FTR with a retroactive date of July 2, 2011, the original date this conversion should have taken effect. (*Id.*) As a result of this mistake, "Jordan did not lose any pay, seniority, or other benefits of her new position." (*Id.* at ¶ 31.) Given the widespread effect of the administrative error and the collective bargaining agreement, this delay does not constitute an adverse employment action, nor does it raise any question of a possible pretextual motive by the defendant.[14]

_____

[14] Jordan further attempts to convince the Court that a fellow employee, Frederick Dick, was treated more favorably than her, essentially because his conversion to FTR went more smoothly than hers did. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 38–40.) The Court is unconvinced that the differences between their conversions raise any questions about retaliation or disparate treatment, and therefore dismisses this allegation. Her allegation that Mittendorff's presence on the DRAC committee constituted a conflict of interest is similarly unavailing. (*Id.* at 25.) And although the plaintiff frequently states that management failed to follow USPS policy when referring her case to DRAC, she offers no evidence of any specific USPS policies violated in over 300 pages of exhibits included with her most recent filing. (*Id.* at 23–25.)

The instant action before the court presents a situation similar to *Kunamneni v. Locke*, a case recently decided in this district: "Though Plaintiff tediously disputes many facts that are presented in Defendant's summary judgment motion, he failed to prove that there exists some *material* facts in dispute . . . Plaintiff's heavy reliance upon his own statements and nothing else is fatal . . . " *Kunamneni v. Locke*, No. 1:09-CV-005, 2009 WL 5216858 (E.D. Va. Dec. 29, 2009) (citations omitted). Jordan's threadbare allegations, taken as true, amount to little more than the "petty slights" or "minor annoyances" common to the workplace environment and dismissed by the U.S. Supreme Court as insufficient for relief under federal law. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

The Court grants the defendant's motion for summary judgment on the plaintiff's Rehabilitation Act claims.

### IV. Conclusion

The plaintiff missed almost three years of work, but the USPS did not fire her. Its tolerance of her peccadillos bespeaks anything but discrimination. For the reasons set forth above, the Court grants the defendant's motion for summary judgment.

The Court shall enter an appropriate Order.

Date: July 25, 2013
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge